UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 24-mj-8640-BER


UNITED STATES OF AMERICA,

                                        Plaintiff,

vs.

Kevin ALBORNOS,
Jean Paul CHACON,
Juan Garbriel VELAZQUEZ,
Anderson MONTERO,
Jhonaiker MONTES,
Bryan OCHOA,
Braynier OCHOA,
Royner AVILAN, and
Johan ALBORNOS,

                                        Defendants.
_____/

## CRIMINAL COVER SHEET (AMENDED COMPLAINT)

1.    Did this matter originate from a matter pending in the Miami Office of the United States Attorney's Office prior to July 20, 2008?

        Yes            X **No**

2.    Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office (West Palm Beach Office) only prior to December 18, 2011?

        Yes            X **No**

3.     Did this matter originate from a matter pending in the Fort Pierce Office of the United States Attorney's Office prior to August 8, 2014?

Yes          X **No**

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

BY:

JOHN C. McMILLAN
ASSISTANT UNITED STATES ATTORNEY
Admin. No. A5500228
500 S. Australian Ave., Suite 400
West Palm Beach, FL 33401
Office:    (561) 820-8711
John.mcmillan@usdoj.gov

2

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| Kevin ALBORNOS; Jean Paul CHACON; Juan | )    Case No.   24-mj-8640-BER |
| Garbriel VELAZQUEZ; Anderson MONTERO; | ) |
| Jhonaiker MONTES; Bryan OCHOA; | ) |
| | ) |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____12/02/24 - 12/03/2024_____ in the county of __Palm Beach and elsewhere__ in the

____Southern____ District of __Florida, and elsewhere__ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846; | Conspiracy to Possess with Intent to Distribute a Controlled Substance (Fentanyl and Methamphetamine); |
| 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846; and | Attempted Possession with Intent to Distribute a Controlled Substance (Fentanyl and Methamphetamine); and |
| 18 U.S.C. §§ 924(c)(1)(A), 2 | Possession of a Firearm in Furtherance of a Federal Drug Trafficking Crime as alleged above; Principals (Aiding and Abetting) |

This criminal complaint is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

FILED BY _____ **TM** ____ D.C.

**Dec 4, 2024**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - WPB

_____
*Complainant's signature*

Mark Finnamore, Special Agent, ATF
*Printed name and title*

Subscribed and sworn to before me in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone (Facetime).

Date: December 4, 2024

_____
*Judge's signature*

City and state: _____West Palm Beach, Florida_____

Bruce Reinhart, United States Magistrate Judge
*Printed name and title*

AO 91 (Rev. 08/09)   Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Braynier OCHOA; Royner AVILAN; and Johan ALBORNOS | ) | Case No.   24-mj-8640-BER |
| | ) | |
| | ) | |
| Defendant(s) | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ 12/02/24 - 12/03/2024 _____ in the county of _ Palm Beach and elsewhere _ in the

_ Southern _ District of _ Florida, and elsewhere _ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846; | Conspiracy to Possess with Intent to Distribute a Controlled Substance (Fentanyl and Methamphetamine); |
| 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846; and | Attempted Possession with Intent to Distribute a Controlled Substance (Fentanyl and Methamphetamine); and |
| 18 U.S.C. §§ 924(c)(1)(A), 2 | Possession of a Firearm in Furtherance of a Federal Drug Trafficking Crime as alleged above; Principals (Aiding and Abetting) |

This criminal complaint is based on these facts:

**Please see attached Affidavit**

FILED BY_____ **TM** ___D.C.

**Dec 4, 2024**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - WPB

☑ Continued on the attached sheet.

_____
Complainant's signature

Mark Finnamore, Special Agent, ATF
Printed name and title

Subscribed and sworn to before me in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone (Facetime).

Date: **December 4, 2024**

_____
Judge's signature

City and state: _____ West Palm Beach, Florida _____

Bruce Reinhart, United States Magistrate Judge
Printed name and title

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Mark Finnamore, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41 (a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and have been since May 2017. As part of my training to become an ATF Special Agent, your affiant attended six months of specialized training sponsored by the Federal Law Enforcement Training Center in Glynco, Georgia. As a result of this training, your affiant has been certified as a Federal Investigator and has received specific training involving violations of federal law. Your affiant has also received ATF specific training in the determination of probable cause and in the use of warrants and complaints to enforce federal firearms laws. Your affiant has participated in over 10 investigations related to armed robbery and Hobbs Act Robbery.  Your affiant has participated in excess of 150 investigations related to the distribution of narcotics and illicit possession of firearms. Your affiant is currently assigned to the HIDTA North Field Office.

2.      The facts contained in this affidavit are based on my personal knowledge, as well as information relayed to me by other law enforcement personnel involved in this investigation. This affidavit is being submitted for the sole purpose of establishing probable cause to believe that Kevin ALBORNOS, Jean Paul CHACON, Juan Gabriel VELASQUEZ, Anderson MONTERO, Jhonaiker MONTES, Bryan OCHOA, Braynier OCHOA, Royner AVILAN, and Johan ALBORNOS, did knowingly and willfully combine, conspire, confederate, and agree with each other to possess with intent to distribute a controlled substance, and attempt to possess a controlled

substance, that is, fentanyl and methamphetamine in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846, and did knowingly possess a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Sections 924(c) and 2.

      3.     I have personally participated in the investigation set forth below. I am familiar with the facts and circumstances of the investigation through my personal participation; from discussions with other law enforcement officers; from my discussions with witnesses involved in the investigation; and from my review of records and reports relating to the investigation. Unless otherwise noted, wherever in this Affidavit I assert that a statement was made, the information was provided by another ATF agent, law enforcement officer or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in partial unless otherwise indicated. Because this Affidavit is being submitted for the limited purpose of establishing probable cause in support of a Criminal Complaint, I have not included details of every aspect of the investigation. Facts not set forth herein are not being relied on in reaching my conclusion that the requested warrant should be issued, nor do I request that this Court rely on any facts not set forth herein in reviewing this application.

## PROBABLE CAUSE

### *Summary*

      4.     The warrant application is submitted in furtherance of law enforcement's investigation of a "crew" of narcotics traffickers who have traveled to the Southern District of Florida to rob a person they believe to be another drug trafficker, but who is in reality an undercover agent, of approximately 27 kilograms of Fentanyl and 100 pounds (approximately

45.45 kilograms) of Crystal Methamphetamine.  Specifically, this application addresses an identified group of individuals participating in the narcotics trafficking network consisting of Kevin ALBORNOS and multiple individuals who allegedly traveled from Houston, Texas to West Palm Beach, Florida to organize a Home Invasion Robbery to rob the victim of 27 kilograms of Fentanyl and 45 kilograms of methamphetamine.

5.      This investigation was initiated by Homeland Security Investigations (HSI) and the Broward County Sheriff's Office (BSO) in or around late-August, 2024, when the foregoing agencies arranged through the use of an undercover officer operating under the direction of HSI (UC-1), to negotiate a controlled purchase of approximately 100 pounds of Crystal Methamphetamine from SANTIAGO in Broward County, Southern District of Florida.   SANTIAGO is what is known to law enforcement as a Drug Trafficking Organization (DTO) cell leader, that is, a person who will coordinate smuggling large quantities of narcotics into the United States from Mexico. SANTIAGO is suspected of being affiliated with the Sinaloa Cartel. This purchase of Crystal Methamphetamine was organized as a purchase of 100 pounds of narcotics in exchange for $300,000.  It should be noted that 100 pounds is equivalent to approximately 45.45 Kilograms.  Ultimately, law enforcement obtained the 100 pounds of Crystal Methamphetamine, but full payment was never provided to SANTIAGO.

6.      After this payment did not occur, SANTIAGO contacted UC-1 on several occasions on September 16th and 17th of 2024, attempting to get UC-1 to provide the remining money which was owed to SANTIAGO.  UC-1 declined to provide the money and ultimately stopped all contact with SANTIAGO and returned to South Florida.  Your affiant notes that while your affiant continues to refer to HSI UC as "UC-1" herein, it does not appear

SANTIAGO is aware that UC-1 is a U.S. Law Enforcement Officer and believes him to be another drug dealer.

7.      In the following weeks leading into the month of October 2024, SANTIAGO contacted a law enforcement confidential informant (hereinafter "the HSI CI") attempting to discover the whereabouts of UC-1. SANTIAGO stated he was attempting to locate UC-1 in order to get the money he was owed. Those communications were recorded by the HSI CI.

8.      On October 17, 2024, the HSI CI was contacted by SANTIAGO and was asked to provide the residential address for the UC. This communication was recorded. Ultimately, the CI stated he did not want to be involved in the harming of the UC but advised that he knew someone else who UC-1 had also upset and suggested that that person would likely be willing to help SANTIAGO find UC-1.

9.      On October 18, 2024, a telephone number belonging to an additional Broward Sheriff's Office (BSO) undercover (hereinafter "UC-2"), was provided to SANTIAGO by the HSI CI in a recorded communication. The CI stated that the number belongs to a narcotics trafficker who was wronged by UC-1 and who is willing to set up UC-1 for SANTIAGO.

10.     Communications were initiated between UC-2 and SANTIAGO which ultimately culminated in the introduction of Kevin ALBORNOS.

11.     After several telephone calls, on October 30, 2024, SANTIAGO contacted UC-2 and in a recorded communication, stated that he will be putting UC-2 in contact with SANTIAGO's local contact who was 3 hours away from South Florida. SANTIAGO stated he is would make a 3-way telephone call between him, UC-2, and the local contact to make arrangements for a meet. SANTIAGO stated that the local contact will be coming with a few

other people. The 3-way telephone call was attempted by SANTIAGO but the UC missed the call.

12.     On October 31, 2024, a male using the phone number of 786-256-9791 contacted UC-2 and advised that they would not be able to travel to South Florida due to car trouble and apologized to UC-2 for the delay. It should be noted that open-source records reflected the owner of this telephone number to be Kevin ALBORNOS.

13.     On November 7, 2024, the HSI CI received a telephone call from SANTIAGO which was recorded. During this telephone call SANTIAGO advised that the contact in Orlando was having car trouble and that was the reason he was unable to make the trip. SANTIAGO thereafter discussed potentially sending a new crew from South Florida. SANTIAGO explained that if the Orlando contact is unable to get organized, he will have another crew reach out to UC-2. During this conversation SANTIAGO asked what kind of business UC-2 was involved in. The CI stated that UC-2 is a "big boss" in the narcotics game. Additionally, during this conversation, SANTIAGO asked the CI for information about the type of house UC-1 resided. SANTIAGO stated he has an additional crew of men who work for the "organization" in California and that they have worked for SANTIAGO in the past and will be sent to visit UC-1 if necessary.

14.     On December 1, 2024, UC-2 was contacted by SANTIAGO who stated a crew would be traveling to South Florida to meet with UC-2 and to prepare for the robbery. SANTIAGO stated that the new crew would be traveling with Kevin ALBORNOS to the West Palm Beach area to meet UC-2. It was determined that the crew would be arriving to the West Palm Beach area on December 2, 2024, around 4:00 PM.

First Meeting Boca Raton, FL

5

15.     On December 2, 2024, UC-2 arranged a meeting between Kevin ALBORNOS, his crew and UC-2 at 8095 Glades Road, Boca Raton, Palm Beach County, Southern District of Florida.  During this meeting, which was recorded, Kevin ALBORNOS and six other males who were later identified as Juan Gabriel VELAZQUEZ, Anderson MONTERO, Jhonaiker MONTES, Bryan OCHOA, Braynier OCHOA, and Royner AVILAN arrived to the meeting location in three vehicles, a Silver in color Infiniti Sedan bearing a temporary paper tag: 6802B74, a black in color Toyota Corolla bearing FL tag: RBUK86, and a Mazda sedan bearing FL tag: BT89RJ.  UC-2 explained to the crew that the victim, UC-1, is a drug trafficker who will be in possession of approximately 27 kilograms of Fentanyl and a large quantity of crystal methamphetamine and US currency.  UC-2 explained that UC-1 will be armed and will be accompanied by other armed people.  UC-2 provided everyone in the crew numerous opportunities to withdraw themselves from the robbery and advised that he (UC-2) does not care whether it happens.  All members of the crew stayed at the meet location and continued to converse with UC-2 and discuss the plan.

16.     During this meet, which was translated for your affiant by a fluent Spanish-speaking law enforcement officer, Kevin ALBORNOS made initial contact with UC-2 and discussed logistics of the robbery, at one point assuring UC-2 that the crew will have firearms for the robbery.  Kevin ALBORNOS further informed UC 2 that the crew will bring "silencers" in case the crew has to shoot someone, so that they won't make noise.  Kevin ALBORNOS and UC-2 discussed the prices of Fentanyl and Methamphetamine, with Kevin ALBORNOS asking UC-2 if they were able to sell the narcotics and give the crew money afterwards.

17.     During this meeting VELASQUEZ provided input during the planning conversations and asked several questions to the group. VELASQUEZ was involved in the conversation related to harming UC-1 and the distribution of the narcotics after the robbery.

6

18.     MONTERO during this meeting was instructing the crew as to how to operate the robbery. MONTERO provided a large amount of input in the conversations and specifically stated that if the crew has to kill the victim, they will kill the victim. Further, MONTERO stated that if the crew get's 50 "kilos" and money, the crew will split everything evenly. MONTERO then asked UC-2 how long it would take to sell everything that is taken.

19.     MONTES during this meeting was physically acknowledging the statement made by others during the meeting and was present for all the conversations related above. MONTES would gesture that he understood what was being said and was present when everyone in the crew was given an "out" of the robbery.

20.     Bryan OCHOA during this meeting specifically asked if the crew would be taking jewelry during the robbery. Bryan OCHOA was providing input during the entirety of the conversation regarding the robbery.

21.     Braynier OCHOA during the first meeting was extremely active in the conversations regarding the robbery. Braynier OCHOA was communicating with the rest of the crew and UC 2 regarding the planning process for the robbery, asked about prices of Fentanyl and asked about how the proceeds of the robbery would be split. Further, OCHOA provided his input on how the robbery should be executed.

22.     AVILAN during this meeting was communicating with the crew and UC-2 regarding the planning process of the robbery and asked if the crew could take jewelry during the robbery.

23.     UC-2 at the end of the meeting stated that they would be expecting to hear from their contact the next day, 12/02/2024 regarding the location of UC-1 and everyone would have to

7

meet again.  The crew separated into the three vehicles and departed the area to Orlando and Fort Myers, FL.

2nd Meet Boca Raton, FL

24.     On December 3, 2024, UC-2 arranged a second meeting between Kevin ALBORNOS and his crew to confirm that the crew had all of their equipment to include firearms. The meeting was set to take place at the McDonalds located at 23073 Sandalfoot Plaza Drive, Boca Raton, Palm Beach County, Southern District of Florida.  Ultimately, Kevin ALBORNOS did not attend this meeting as he was still traveling south from Orlando back to South Florida.  All other members of the crew came to the meeting with UC-2 along with a new member of the robbery crew, Jean Paul CHACON.  During this second meeting, all members of the crew were present when UC-2 provided multiple opportunities for the crew to leave and not do the robbery.  All robbery crew members stayed at the meeting location and continued discussions about the robbery. In particular, CHACON was very active in conversations regarding the plans of the robbery. During this meeting the members of the crew discussed removing Kevin ALBORNOS from the robbery.  The crew stated that Kevin ALBORNOS was unreliable, and they did not trust him and would prefer to do the robbery without ALBORNOS.  Further, the crew stated that Kevin ALBORNOS needed to be careful because people get killed for doing the things that he is doing. The crew stated that they had their own "equipment" and did not need Kevin ALBORNOS in order to do the robbery.  UC-2 at this time was contacted by Kevin ALBORNOS who stated they were approaching South Florida.  During this meet, the crew arrived in 3 vehicles the Black Toyota Carolla and Silver Infiniti from the first meeting, as well as a light-colored Toyota Prius bearing California Tag: 9MRN133.  UC 2 told the crew to stand by in the area until Kevin ALBORNOS arrived and UC-2 received contact from his source.

8

## Final Meeting

25.     Later in the evening on December 3, 2024, UC-2 organized a final meeting between UC-2, ALBORNOS, CHACON, VELASQUEZ, MONTERO, MONTES, Bryan OCHOA, Braynier OCHOA, and AVILAN.  UC 2 organized for the crew to meet UC 2 in the Tamarac, Southern District of Florida area, and travel to an Undercover meeting location in Broward County, Florida, which is also located within the Southern District of Florida.  At this meeting all members of the crew were in attendance in addition to a new crew member, Johan ALBORNOS, the brother of Kevin ALBORNOS.  This meeting was audio and video recorded.  During this meeting UC-2 again provided the entire crew with the opportunity to withdraw from the robbery.  The entire crew stayed at the meeting and continued to prepare.  Additionally, due to Johan ALBORNOS becoming involved, UC-2 reiterated the details regarding UC-1 and what should be expected by the crew.

26.     During this meeting Kevin ALBORNOS was giving instructions to the rest of the group on how the movement of the group should occur during the robbery.  Kevin ALBORNOS was displaying hand movements and gestures depicting firearms and showing how the crew would rush into the house during the robbery.  Kevin ALBORNOS stated how he was prepared to use deadly force to eliminate their target if needed and instructed the rest of the group to do so.  During his post-*Miranda* recorded interview, ALBORNOS reiterated his knowledge of the plan to commit the robbery for the narcotics and money.

27.     During the final meeting CHACON took an active role in the conversations regarding the robbery and was in possession of a firearm during this meeting.  During the meeting CHACON was seen by surveillance changing the license plate on the Infiniti sedan, a tactic commonly used to conceal the identity of a vehicle.  Finally, CHACON also in the middle of the

9

meeting put a black in color balaclava over his head which is a type of mask utilized to conceal identities.

28.     VELASQUEZ during the final meeting was seen during the meeting wearing latex gloves and was in possession of a firearm.  VELASQUEZ openly manipulated his firearm numerous times.  Additionally, VELASQUEZ gave input in the conversations as to how the robbery should take place, asked the group several questions about narcotics, money and how everything taken during the robbery will be split amongst the group.

29.     MONTERO during the final meeting was seen wearing gloves and a hooded sweatshirt, appearing to attempt to hide his identity.  MONTERO was actively involved in the conversations regarding the robbery and provided his input regarding details of the robbery.

30.     MONTES during the last meeting assisted in changing out the license plate on the Infiniti sedan and was found to be in possession of a replica "bb gun" that shared similar characteristics with a real firearm.  MONTES was present for all of the conversations regarding the robbery at the final meeting.  It should be noted that MONTES has a suspected Tren De Agua (TDA) tattoo on his elbow.

31.     Bryan OCHOA asked numerous questions during the final meeting regarding the robbery and gave his input to other members of the crew as to how the robbery should take place. Bryan OCHOA was present when UC 2 provided everyone in the crew the opportunity to withdraw from the robbery.

32.     Braynier OCHOA during the last meeting assisted the other crew members in changing the Infiniti sedan's license plate.  OCHOA then proceeded to put on latex gloves during the discussion of detail of the robbery.

10

33.     AVILAN during the final meeting was very active during the meeting looking around the meet location.  Eventually AVILAN grabbed a hand tool from the meeting location and placed it in his pocket.  AVILAN was present for the entirety of the meeting.

34.     Johan ALBORNOS initially stayed in the vehicle during the final meeting before being asked to exit the vehicle and join the rest of the crew for the meeting.  Johan ALBORNOS was directly addressed by UC-2 and was asked if they were in for the robbery or if they wanted out of it.   Johan ALBORNOS stated that they were good to go and he wanted to take part.  Johan ALBORNOS stated he was taking part in the job.  Johan ALBORNOS was present for the entirety of the conversation regarding the details of the robbery and did not make any attempt to leave.

35.     The entire crew met with UC-2 and discussed the robbery in depth and even conducted "walk throughs" of how the crew would brandish their firearms and subdue the victim. In the bathroom of the meeting location, the targets would practice drawing their weapons in the mirror.  After UC-2 had seen the firearms, the crew had brought with them and the crew had put

11

on their latex gloves and masks, UC 2 gave the arrest signal, and the entire crew was taken into custody.

**FURTHER YOUR AFFIANT SAYETH NAUGHT.**

Respectfully submitted,

MARK FINNAMORE, SPECIAL AGENT
BUREAU OF ALCOHOL, TOBACCO,
FIREARMS, AND EXPLOSIVES

ATTESTED TO ME TELEPHONICALLY (VIA FACETIME) BY THE APPLICANT IN ACCORDANCE WITH THE REQUIREMENTS OF FED. R. CRIM. P. 4.1 THIS ____4th____ DAY OF DECEMBER, 2024.

BRUCE  REINHART
UNITED STATES MAGISTRATE JUDGE

12

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: Kevin ALBORNOS; Jean Paul CHACON; Juan Garbriel VELAZQUEZ; Anderson MONTERO; Jhonaiker MONTES; Bryan OCHOA; Braynier OCHOA; Royner AVILAN; Johan ALBORNOS

**Case No:** _____

**Count # 1**
Conspiracy to Possess with Intent to Distribute Controlled Substances, to wit, 40 grams or more of a mixture or substance containing a detectable amount of N-phenyl-N-[ 1- ( 2-phenylethyl ) -4-piperidinyl ] propenamide, commonly known as "fentanyl" and 500 Grams or More of a Mixture and Substance Containing Methamphetamine/Over 50 Grams of Methamphetamine (Actual)
Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), 846
* **Max. Term of Imprisonment:** Life
* **Mandatory Min. Term of Imprisonment (if applicable):** 10 years
* **Max. Supervised Release:** Life
* **Max. Fine:** $10,000,000.00
* **Special Assessment:** $100.00
* **Immigration Consequences of Removal (Deportation) if the defendant in not a U.S. Citizen, following conviction.**

**Count # 2**
Attempted Possession with Intent to Distribute Controlled Substances, to wit, 40 grams or more of a mixture or substance containing a detectable amount of N-phenyl-N-[ 1- ( 2-phenylethyl ) -4-piperidinyl ] propenamide, commonly known as "fentanyl," and 500 Grams or More of a Mixture and Substance Containing Methamphetamine
Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), 846
* **Max. Term of Imprisonment:** Life
* **Mandatory Min. Term of Imprisonment (if applicable):** 10 years
* **Max. Supervised Release:** Life
* **Max. Fine:** $10,000,000.00
* **Special Assessment:** $100.00
* **Immigration Consequences of Removal (Deportation) if the defendant in not a U.S. Citizen, following conviction.**

**Count # 3**
Possession of a Firearm in Furtherance of a Federal Drug Trafficking Crime as Alleged in Counts 1 and 2 above; Principle
Title 18, United States Code, Sections 924(c)(1)(A)
* **Max. Term of Imprisonment:** Life
* **Mandatory Min. Term of Imprisonment (if applicable):** 5 years' imprisonment consecutive

to any other term of imprisonment imposed.

**\* Max. Supervised Release:** Five (5) years

**\* Max. Fine:**  $250,000.00

**\* Special Assessment**: $100.00

**\* Immigration Consequences of Removal (Deportation) if the defendant in not a U.S. Citizen, following conviction.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NUMBER: _____

### BOND RECOMMENDATION

DEFENDANT:   Kevin ALBORNOS
_____

Pre-Trial Detention
_____
(Personal Surety) (Corporate Surety) (Cash) (Pre-Trial Detention)

By: _____
AUSA:   John C. McMillan

Last Known Address: _____

_____

_____

What Facility: _____

_____

Agent(s):   ATF Special Agent Mark Finnamore
(FBI)   (SECRET SERVICE)   (DEA)   (IRS) (ICE) (**OTHER**)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NUMBER: _____

### <u>BOND RECOMMENDATION</u>

DEFENDANT:   Jean Paul CHACON
_____

Pre-Trial Detention
_____
(Personal Surety) (Corporate Surety) (Cash) (Pre-Trial Detention)


By: _____

AUSA:   John C. McMillan


Last Known Address: _____

_____

_____

What Facility: _____

_____

Agent(s):   ATF Special Agent Mark Finnamore
_____
(FBI)   (SECRET SERVICE)   (DEA)   (IRS) (ICE)   (<u>**OTHER**</u>)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NUMBER: _____

### <u>BOND RECOMMENDATION</u>

DEFENDANT:   Juan Garbriel VELAZQUEZ
_____

Pre-Trial Detention
_____
(Personal Surety) (Corporate Surety) (Cash) (Pre-Trial Detention)

By: _____
AUSA:   John C. McMillan

Last Known Address: _____

_____

_____

What Facility:   _____

_____

Agent(s):   ATF Special Agent Mark Finnamore
_____
(FBI)   (SECRET SERVICE)   (DEA)   (IRS) (ICE) (<u>OTHER</u>)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NUMBER: _____

### BOND RECOMMENDATION

DEFENDANT:   Anderson MONTERO
_____

Pre-Trial Detention
_____
(Personal Surety) (Corporate Surety) (Cash) (Pre-Trial Detention)

By: _____
AUSA:   John C. McMillan

Last Known Address: _____

_____

_____

What Facility: _____

_____

Agent(s):      ATF Special Agent Mark Finnamore
(FBI)   (SECRET SERVICE)   (DEA)   (IRS) (ICE) (**OTHER**)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NUMBER: _____

### **BOND RECOMMENDATION**

DEFENDANT:   Jhonaiker MONTES
_____

Pre-Trial Detention
_____
(Personal Surety) (Corporate Surety) (Cash) (Pre-Trial Detention)


By: _____
     AUSA:   John C. McMillan


Last Known Address: _____

_____

_____

What Facility: _____

_____

Agent(s):   ATF Special Agent Mark Finnamore
(FBI)   (SECRET SERVICE)   (DEA)   (IRS) (ICE)   (**OTHER**)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER: _____

### BOND RECOMMENDATION

DEFENDANT:   Bryan OCHOA _____

Pre-Trial Detention
(Personal Surety) (Corporate Surety) (Cash) (Pre-Trial Detention)

By: _____

AUSA:   John C. McMillan

Last Known Address: _____

_____

_____

What Facility:   _____

_____

Agent(s):   ATF Special Agent Mark Finnamore _____
(FBI)   (SECRET SERVICE)   (DEA)   (IRS) (ICE)   (**OTHER**)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NUMBER: _____

### **BOND RECOMMENDATION**

DEFENDANT:   Braynier OCHOA
_____

Pre-Trial Detention
_____
(Personal Surety) (Corporate Surety) (Cash) (Pre-Trial Detention)

By: _____
AUSA:   John C. McMillan

Last Known Address: _____

_____

_____

What Facility: _____

_____

Agent(s):   ATF Special Agent Mark Finnamore _____
(FBI)   (SECRET SERVICE)   (DEA)   (IRS) (ICE)  (**OTHER**)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NUMBER: _____

### <u>BOND RECOMMENDATION</u>

DEFENDANT:   Royner AVILAN
_____

Pre-Trial Detention
_____
(Personal Surety) (Corporate Surety) (Cash) (Pre-Trial Detention)

By: _____
     AUSA:   John C. McMillan

Last Known Address: _____

_____

_____

What Facility: _____

_____

Agent(s):   ATF Special Agent Mark Finnamore
_____
(FBI)   (SECRET SERVICE)   (DEA)   (IRS) (ICE) (<u>**OTHER**</u>)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER: _____

### BOND RECOMMENDATION

DEFENDANT: Johan ALBORNOS
_____

Pre-Trial Detention
_____
(Personal Surety) (Corporate Surety) (Cash) (Pre-Trial Detention)

By: _____
AUSA:   John C. McMillan

Last Known Address: _____

_____

_____

What Facility: _____

_____

Agent(s):   ATF Special Agent Mark Finnamore_____
(FBI)   (SECRET SERVICE)   (DEA)   (IRS) (ICE)   (**OTHER**)